We'll hear argument first this morning in Case 13-1074, United States v. Wong. Mr. Martinez. Mr. Chief Justice, and may it please the Court, three features of the FTCA's text in history make clear that Congress did not want to allow equitable tolling of its time bar. First, Congress drafted that bar in 1946 using jurisdictional language transplanted from the Parallel Tucker Act context. Second— Is the word jurisdiction used? The word jurisdiction was not used in that language, Your Honor, but the Court had interpreted that language in the Tucker Act context in six cases, beginning with the Court's decision in Kendall in 1883. And that decision, those line of cases had made very clear not only that the time bar was jurisdictional, but— That's the Court. Congress did not say jurisdiction. And I'm sure you're well aware that this Court for some time now has been explaining that jurisdiction is a word of many meanings, too many meanings, and has tried to distinguish jurisdiction, meaning subject matter or personal, from rules, once a case fits jurisdiction, how it will be processed in the Court. And it seems to me a time limitation, even a very stringent time limitation, is not jurisdictional. Your Honor, I think two points on that. First of all, I think that when Congress acted in 1946 and it transplanted the identical words of the statute that the Tucker Act — the statute governing Tucker Act claims, Congress understood itself to be incorporating the same settled meaning. And those words had already been given a jurisdictional meaning by this Court. Jurisdictional in the narrow sense? In the sense that it went to the Court's ability to hear the case. Yes. And jurisdictional consequences were attached to those words. In other words, the issue could not be waived by the government and no equitable tolling was available. In this Court's more recent cases, I think the ones that, Justice Ginsburg, you were referring to in the Henderson case, what this Court said was that the Court will presume that a provision is jurisdictional when a long line of this Court's cases, undisturbed by Congress, has treated a similar provision as jurisdictional. And in this case, we have a statute that had been interpreted by a long line of this Court's decisions, all in the Tucker Act context, very similar, identical. But not the Clark Claims Act. The Tucker Act, I think, the line that the Court drew, it said if we've characterized these as jurisdictional in a prior case, we will stick with that. But in the future, we're not doing that anymore. But I think what the Court has said, both in the cases addressing jurisdiction and in the cases, in the Irwin line of cases addressing the available, the availability of equitable tolling, is that the Court is not going to look for magic words in the statute. It's going to look to the text, the context, and the relevant historical treatment, and that the overarching purpose of the inquiry is going to be to find out what Congress understood itself to be doing at the time that it enacted the statute. But, Mr. Martinez, wouldn't that argument suggest that Irwin was really only good as to new statutes, as to statutes that were passed after Irwin? I don't think so, Your Honor. I think what the Court did in Irwin, it didn't conduct a lengthy historical analysis of all statutes that had ever been passed. But what it did was it based its conclusion and the presumption on a kind of logical inference. The Court essentially reasoned, as I understood the decision, as follows. The Court said that when Congress – we think in the mine run of cases, when Congress wants to take the big step of waiving sovereign immunity, it's reasonable to think that Congress also likely wanted to take the small step of allowing equitable tolling. And that may well have been true in 1990 when Irwin was announced. It may have even been true in 1972 when the statute that was addressed in Irwin was announced. But we know for certain, and I think the parties agree on this, that the rule in 1946 when the FTCA was passed was something quite different. And the Court addressed that in the Soriano case just a few years later, in 1977. Ginsburg. What was different about 1972? They were pre-Irwin. So why wouldn't a 1972 statute, the extension of Title VII to Federal employees, why wouldn't that fall under the old regime instead of the fresh look that Irwin took of it in 1990? As applied to a 1972 statute. Well, I think the key thing – the issue in this case is obviously the FT – is of course the FTCA. And I think there are significant distinctions between the FTCA, which was passed in 1946, and the provision that was passed in 1972 that was addressed in Irwin. And we have statute-specific evidence that's very detailed and is much, much more extensive than the evidence that was before the Court or that was available with respect to Title VII. But you see, I would – I guess I would have thought that really anything pre-Irwin, the government could stand up and make a very, very similar argument, which is, you know, in this world we actually thought that a statute of limitations with respect to a suit against a government was jurisdictional, did not include equitable tolling, that there were really no decisions the other way, that Congress thought of that as the background rule. And so what's to prevent this case from essentially becoming everything prior to 1990 is presumed to be jurisdictional, contra Irwin? Well, we're not asking for that presumption, and we don't think that the Court needs to apply that presumption. I think what the Court needs to do is to look at the language of Irwin, which says that there's a presumption. It's based on its kind of logical inference about the mine run of cases, but it also says that the presumption is rebuttable. And it's rebuttable based on statute-specific evidence where the government can come forward and overcome the presumption by showing that with respect to a particular law, Congress had a different intent in mind. Sotomayor So if there's ambiguity, what breaks the tie? You've made your argument, but there are some counters. The two most important are that Congress took this provision out of the jurisdictional section and put it in a different section, number one, and number two, it said treat the government like you would treat any other party. So those two counter. How do we break the tie? Well, I think if there were, in fact, a tie, I think the Irwin does put essentially the slight thumb on the scale in favor of no equitable tolling. But I don't think that there's a tie in this case for a number of reasons. And let me just address, I think the primary reason is the Tucker Act point, which I mentioned. But let me address the two textual points that you raised, Your Honor. The first argument about the placement of the provisions, as your – the Court knows, the provisions were separated in 1948 as part of that recodification. And in the recodification law itself, in section 33 of the recodification law, Congress expressly forbade any inference of legislative construction of what the statutes meant based on the chapter of the U.S. Code of Title 28 in which it was placed. And so the argument that my friend makes that the placement of the provisions in different chapters, that's an argument that Congress expressly took off the table. With respect to the second text point of the recodification law, that was in section 33 of the 1948 recodification law. And not only that, Your Honor, but I think this Court can support that. It does. The legislative history supports it. It's not just the texture, Justice Scalia. With respect to the second argument, Justice Sotomayor, that you raised, I think it's true that there's language elsewhere in the FTCA, in section 2674, about the idea that the FTCA is intended to create liability where a private person – in circumstances where a private person would be liable under State law. But what this Court recognized in Richards and what a lot of courts have recognized, including Judge Friendly's opinion for the Second Circuit in the Cossack case, is that the time bar provision, 2401, is an exception to that principle and is essentially a circumstance in which Congress specifically indicated that it didn't want the same rule to apply as would apply between private parties in – under State law. And so we don't think that those textual arguments get a lot of traction here, and they certainly don't overcome the strongest textual argument, which is on our side, which is, of course, the express and deliberate incorporation of the Tucker Act language that it applied to Tucker Act suits in the Court of Claims. Ginsburg. Tucker Act doesn't have, to the same extent, in the same manner and to the same extent as with respect to a private party. That's new in the Tort Claims Act. It's true that the Tucker Act doesn't have that language. I don't think it needed that language because the Tucker Act – essentially that language in the Tort Claims Act, I think, is intended to point to the substantive law that's supposed to be applied, as this Court recognized in Richards. And so it says, you know, look to State law when you're applying the tort law. The Tucker Act's a little different because there you're applying Federal law. You're applying Federal constitutional law, Federal statutory law, or the Federal common law of contracts in the Tucker Act context. So it didn't need that language. But what the Court has recognized in its cases is, again, that that principle of sort of the parity principle, you know, treat the government like a private party, that 2401B is really an exception to that principle. Kagan, I take it that your argument would apply not only to 2401B, but also to 2401A? We – the government's position is that 2401A is also jurisdictional and not subject to tolling. But our argument is really that the Irwin inquiry requires a statute-specific inquiry. And so – But it's the same language. And if I understood the argument you're making, it's your essential argument is this incorporated the Tucker language. Congress knew what the Tucker language meant. Therefore, Congress understood these to be jurisdictional as well. Your Honor, I don't want to resist your point too much, but I do want to point out that 2401A's history is slightly different. The language in 2401A actually originates in the Tucker Act itself in 1887. The language from 2501 actually came from the 1863 statute, and that's the language – the actual, you know, the 12-word phrase that's repeated in 2401B comes from that provision. So there are some slight differences, but we're not going to fight. We certainly would agree that the – that the 2401A language is jurisdictional and that's being litigated in the lower court. Kagan. I mean, I have to think that this is just all over the U.S. Code, this kind of language. There's nothing unusual about this language, shall be barred. This is kind of the classic language, right? I think that the shall be barred or forever barred, that language does appear in a couple of places. But I think what's important for purposes of our argument is not just that two-word phrase, but the broader phrase, because the broader phrase is what shows that when the human being who sat down on behalf of Congress to actually write this statute, it shows, I think, that he was basing it – he was essentially cut and pasting from the preexisting Tucker Act provision. And so that language that's relevant is not just forever barred, but the phrase every claim against the United States cognizable shall be forever barred unless. And I think that it's very – it's not just the language itself, although the language is identical, but it's clear that Congress, when it was drafting the FTCA, was – was – its goal was to fill a gap that had been left open in the Tucker Act. The Tucker Act itself said that it would apply to certain claims, quote, not sounding in tort, unquote. And the legislative history that – that we've cited in our briefs discussing the purposes of the FTCA makes clear that Congress was looking at the Tucker Act, they saw that there was this hole for tort claims, they wanted to plug that gap, and they wanted to give tort claimants, in the language of the – of the relevant committee reports, the same right to a day in court that claimants had under the Tucker Act. And I'm assuming that's what Congress was looking at. Kagan. And it sounds to me like the way you're going about this inquiry, we're going to have to take a case on every statute of limitations in – in the U.S. Code, because you're saying, well, this is similar enough, and maybe this would be a little bit different, it has a few fewer words, and then we have to look at the history and we have to stare at the drafting concerns of Congress. And I thought that Irwin was supposed to take us away from all that. I don't think – I don't think it's correct that you would have to take a case on every statute of limitations, Your Honor. I think that – that in those cases where the government can come forward with strong statute-specific arguments, that the statute was – was lifted, for example, from the Tucker Act or from other similar statutes that had been repeatedly interpreted as jurisdictional, I don't think there's going to be much question about whether tolling is allowed. Scalia, but Irwin said this was just a presumption, right? And that said the presumption could be overcome, and it made clear that this is a question of what was the congressional intent. When you put all those three together, of course you have to look at each statute separately, don't you? I couldn't agree more, Justice Scalia, and I think that's – that's actually consistent with this Court's practice. After Irwin, the Court has repeatedly looked at different Federal statutes, and it's conducted exactly the kind of statute-specific inquiry into the text, the history, the precedent, trying to figure out what Congress was thinking. Alito, if you have looked at the statutes that could be interpreted one way or the other, are there any that you have concluded are not jurisdictional other than those that we have already held are not jurisdictional? Your Honor, I confess that I haven't gone through the code with an effort to try to figure out where ones that are not jurisdictional. I think the ones that I have looked at are the ones that the Court has addressed most significantly in the Brokamp case, in Begley, in Auburn Regional, in John R. Sand and Gravel, and now in this case. And I think what those precedents show is that what the Court has done with Irwin is not to treat it as a conclusive presumption, but rather to treat it as a rebuttable presumption. Sure. But there are two kinds of ways that you can rebut something. One is by saying here's something very distinctive about this statute that shows that Congress meant for it to be jurisdictional, that shows that Congress didn't mean for equitable tolling to apply. But that's not the kind of argument you're making here. You're making an argument that basically says in this pre-Irwin world, Congress understood that when it came to statutes against the government, they would be jurisdictional and equitable tolling would not apply, see the Tucker Act. And that could be said, I think, for every statute with respect to suits against the government prior to Irwin. With respect, Justice Kagan, that's not our argument. Our argument is specific to the FTCA, and I think I don't want to give you more than three, the golden rule of three, but there are five distinctions. I can just tick them off. One is the incorporation of the express language of the Tucker Act. Two is the fact that this Court addressed this particular statute, or at least tort claims, in the Soriano decision. It also addressed this particular provision, 2401B in Kontrick. Ginsburg-Garza I thought Soriano was in the Tucker Act case. Goldstein, Jr. It did, Your Honor, but the Court expressly addressed, it said that essentially that the same rule that would apply in Tucker Act cases would also apply to statutes waiving sovereign immunity for tort actions. And that was a response to the point that we had made in our brief that the sovereign immunity is what drives it, then the presumption would be overcome in every case against the government because government. I think at a minimum it would – I think what we have in this statute that was not present in Irwin is the fact that this Court had expressly mentioned, you know, tort actions, and then not only did the Court mention it, but then Congress reenacted the statute in 1966, not just against the backdrop of this Court's statement in Soriano, but also against the backdrop of the uniform view of the lower courts, including a number of courts of appeals, that it all said that this statute was jurisdictional, not subject to waiver, not subject to tolling. And so that's another unique feature of this statute, the 1966 reenactment. We also have a number of private laws, ten real-life statutes that were passed by Congress that seem to refer explicitly to 2401b as having – as being a jurisdictional statute. That's very different from Irwin and it's very different from a lot of almost – I would imagine almost any other statute of limitations in the U.S. Code. And then we have a number of other statutes that are repeatedly grappled with the very question that's at issue in this case, which is whether equitable tolling should be permitted under the FTCA. In the bills that it considered before 1946, a number of those bills, 9 out of the 31 that had been proposed, had various types of tolling provisions. Those were left out of the final statute. Since I think the briefs are good briefs and you each have good arguments, and so if it's an open question, I think it's in question, why does the government oppose this? That is to say, compared to contracts, people who are suing on contracts usually have a lawyer, and they have had lawyers. They're dealing with the government, not all. But this is about torts. And people who are hurt with torts are frequently badly hurt. They could be anyone in the world. The government could have treated them very badly. Lots of things can happen. Hurricanes. A lawyer gets deathly ill on the way to the courthouse. The court has a lawyer. The clerk mixes up the papers. Somebody steals the lawyer's briefs and runs off to Chicago. I mean, all kinds of odd things can happen to a victim of a tort caused by the United States. Now, if, in fact, you throw him out on this thing, which I would call a technicality, he has to go to the Senate and he has to ask them for a private bill, which is a drain on their time and somewhat random. So those are the real choices. Now, why, other than, well, we read it and that's what the law is, I got that part and that is not a bad argument on your part, but is there anything else? Is there any sort of functional reason why the government doesn't just say, look, well, this person has been hurt and can win his court, fine, we won't throw him out on the basis of this. If a hurricane happens, et cetera, then let's proceed anyway. Your Honor, as you suggested, our primary argument here is that we should win because the law is on our side. That there's nothing else. That's a good reason, by the way. That's a good reason. In addition to the law being on our side, let me try to give a little bit of context for why Congress and why the United States Department of Justice and the Executive Branch has consistently opposed equitable tolling in these circumstances. I mean, this was heavily debated before 1946 and it's been heavily debated since.  But the conclusion that they've come to is that this is such a ‑‑ this was such a revolutionary step for Congress to take in 1946 to create the tort remedy in the first place. And this was the second great waiver of sovereign immunity. It in some ways, you know, reconceptualized the relationship between the government to the people. And that was a big step. But they were very cautious. They were very careful. And they expressly treated the statute of limitations provision as a safeguard to protect the government from claims that could be brought years afterwards. And so they wanted something that was strict and this was going to ‑‑ the purpose of the limitations provision was going to be to preserve evidence and also to ‑‑ there was another consideration, which was the fact that this was a very controversial bill. It took 20 years for it to get through in the 20th century. But, Mr. Martinez, what you said, it says, no, the choice were statute of limitations or nothing. To get equitable tolling, it's a pretty tough case. In order to get equitable tolling, you must have a truly exceptional case. Maybe the case that we're now ‑‑ that's now before us is such a case. But it is not easy to get equitable tolling. You have to be especially deserving. So isn't that the answer to it? Ordinarily, the statute of limitations will govern. But if there are equitable reasons, then there can be an exception. But those reasons have to be very strong. Martinez, Your Honor, I think that's true. That's how the equitable tolling doctrine has been conceived. And if Congress were rewriting the statute today, it may well decide, it could well decide that that would be a better approach. But the approach that Congress took at the time, and I think this is best reflected in the colloquy that's cited in page 41 of our brief, Congress considered the question of whether in hardship cases, it would be appropriate to give judges some discretion where there was a good reason for a claimant to file late. And that suggestion was raised by Congressman Gwinn. And the Department of Justice, this was two years after the Act, the Department of Justice said, look, it would just be impractical and it would create too much of a burden on the government, and it would be impractical to have kind of a rule that was not hard and fast. And so Congress in 1948, as that colloquy showed, did not think that the FTCA that had been passed two years earlier allowed for equitable tolling. And the consistent view of Congress when it rejected proposals to add tolling nine different times between 1946 and the late 80s was that equitable tolling should not be allowed. And so in light of that statute-specific evidence, I think it's eminently reasonable to conclude that, you know, the law is on our side. Breyer-Cooks So I think it's quite funny what I said, I'm sorry. You've got, of course, the question is the law, all right. I think what I said before is relevant to the law. But the question here is a slightly more subtle one in my mind. I agree with you. The legislative history, et cetera, does show they use jurisdiction nonstop, those are the words. But jurisdiction at that time did not have the Irwin meaning. And so later on, there comes a case. Which case, Irwin, now treats this quite differently than it did before. And isn't the question, or is the question, from the legislative history point of view, a pretty hard one to answer. Did Congress, or would those who passed the bill, looking at the reasons, wanted this statute to pick up the later interpretation of jurisdiction, or would they wanted it to have stayed the same in the face of that later change in how the courts treat the word? I think we're talking about a living Federal Tort Claims Act, is what we're talking about here. That's actually right. Justice Breyer, I think that, first of all, what this Court has always said, of course, is that the goal of statutory construction in this context, as in any other, is to look at the text in light of its context and its historical treatment. What Irwin says is that the goal is to find what the legislative intent was with respect to this particular statute. Breyer, I mean, normally it arises in a much grander context. Normally it arises in the context of changes of terms of the Constitution and so forth. This is not that grand context. But still, in this minor context, why isn't the question the same? How did Congress, or would, because it's hypothetical, they didn't know. It's not hypothetical, because I think Congress did actually address this exact question. Thirty-one bills were discussed between 1925 and 1946, were proposed in Congress involving tort claims, proposed tort claims bills. Nine of those bills were not. They didn't, they had the tolling, they didn't pass it, and normally what they didn't pass isn't something that's really great, strong evidence in light of the meaning of what they did pass. That's normally true, but what this case said, what this Court said in the Mooney's case, is that in the particular context of the FTCA, because there was marked reliance by each succeeding Congress on the bills that had been proposed earlier, that the omission of a provision from the final FTCA that had been there before, we should treat that as a deliberate choice, not an inadvertent omission. So I think it was a deliberate choice here. And I think with respect to the evolution of the statute since then, as of 1966, we know that Congress reexamined the time bar. At that point in time, it was legislating against a backdrop where this Court had suggested in Soriano that it was jurisdictional. The lower courts had uniformly treated it as jurisdictional, and not just by putting the label on it, but by attaching jurisdictional consequences. Congress reenacted the statute without any change in meaning, and then, even until the late 80s, it repeatedly considered proposals to add forms of tolling to the statute. Scalia, if we were to adopt the position that a statute can change in light of current circumstances, what would that Congress think about it today? Would there be any reason to limit that to the Federal Tort Claims Act, that proposition? I think it would be hard to do, and, Your Honor We're into Judge Calabresi's manner of statutory interpretation, right? I think it would be hard to do, but most importantly for this case, I think that approach would put, would essentially be at odds with Irwin, because Irwin says that what governs here is the legislative intent, and that obviously, I think, has to be ascertained at the time the statute was passed. If I could reserve the balance of my time for rebuttal. Thank you, counsel. Mr. Schnapper. Mr. Chief Justice, and may it please the Court, I think it would be helpful to start by pointing out that there are two different background rules at issue here. The first is the rule in Irwin, which concerns the availability of equitable estoppel. And as my brother has pointed out, it is a presumption that a statute's limitations are subject to equitable estoppel. And I think he aptly characterizes its significance by saying it's a thumb on the scale. But not with respect to governmental statutes. I mean, that was a question of first impression in Irwin. The presumption is it's the same presumption. But there's a second background rule here which is somewhat different, and that's the rule Justice Ginsburg pointed to earlier, and that concerns whether a statutory requirement is jurisdictional. Now, there the line of cases are this Court's decisions from Arbaugh to Sebelius just last year, and the requirement there is a clear statement. And that's – a clear statement requirement is considerably more demanding. It's more like a whole hand on the scale. It's not a search for intent in the same way that Irwin suggests. This – the statutory requirement in this case surely does not satisfy the clear statement requirement. The language of 1346a provides that if six requirements are met, the courts shall have jurisdiction. So at this point, the burden is even greater. The Federal Tort Claims Act is highly specific about things like that. It – it – there is an express carve-out for deemed – for things deemed not jurisdictional for pension claims. There is also a provision in section 2671 defining some of the terms in – in 1346. Those would be jurisdictional. But there's no connection between the statute of limitations and the jurisdictional provision. And if I might respectfully disagree with the government about one historical matter, the statute of limitations and the jurisdictional provision have always been separate. The statute of limitations was in section 420 of the original Act, and the jurisdictional provision was in section 410. And they had their own headings back in 1946, and the term – the heading jurisdiction was only for the jurisdictional provision, not for section 2401. So the text of the statute simply doesn't provide the clear statement that it's needed, and there's no connection. Roberts, What did the recodification do? It moved things to different parts of 28 U.S.C., but it – those sections were separate all along. The – and in this regard, we agree with the government, if you advance by the government, in its briefs in Zipes and Arbaugh, which is that when a statute of limitations and a jurisdictional provision are in separate provisions of the statute, which they always have been, that that gives rise to a strong presumption that they're not jurisdictional. Sotomayor, So did we err in McNeil? I'm sorry? Did we err in McNeil? You did not, but McNeil does not hold that the exhaustion requirement is jurisdictional. We disagree with the government about that. The district court had held the requirement was jurisdictional. This Court held only that the requirement hadn't been satisfied. If the Court had used the word jurisdiction, it wouldn't have been any consequence. It would have been, as the Court's phrase goes, a drive-by jurisdictional ruling. But this is less than that. The government asked the Court in McNeil to label that requirement jurisdictional and it didn't. So McNeil is an unsuccessful solicitation of a drive-by jurisdictional ruling. It simply doesn't provide the support that you suggest. There would in any event have been some statutory argument there, because the jurisdictional excuse me, the exhaustion requirement in Section 2675 is in Chapter 171. And the jurisdictional provision does contain the language, subject to Chapter 171. But the statute of limitations is in subchapter 161. There isn't that same cross-reference. Mr. Schnapper, what do you do with what I take to be the government's main argument? They said here are these two statutes waiving the government's sovereign immunity. The Tucker Act, no equitable tolling. The Tort Claims Act comes later. It uses a lot of the same language. It has the same object. So the Tort Claims Act should be interpreted in harmony with the Tucker Act. We think there are a number of problems with that argument. It has various iterations. Maybe I can separate them out. One version of that is that the words shall be forever barred are inherently jurisdictional. And as we noted in our brief, that language is in a number of other statutes. The particular cadence of it, every act shall be forever barred unless, is also in the Clayton Act, which in Motella this Court held was not jurisdictional, and it's in the Fair Labor Standards Act, which is where the government repeatedly contends that equitable tolling is available. So I think the – and, indeed, in the other language that is just lifted verbatim from the two prior acts, and you add to that the fact that the purpose of this statute was to eliminate the exception in the Tucker Act for torts. That was the obvious purpose of it. So they repeat the language of the Tucker Act and say it applies to torts. One would think that the same limitations that applied to the Tucker Act continue to apply. Well, we think not, Your Honor. The – again, the rest of the language of the Tucker Act and the Federal Tort Claims Act are very different. There are 24 sections of the Federal Tort Claims Act, 35 sections of the Tucker Act. The rest of them have almost no overlap. It's just this phrase, which is the same phrase in a number of other statutes. But to get back to the government's historical point about the meaning, about the pre-1946 decisions, as we've suggested in our brief, those decisions never turned on the words shall be forever barred. A series of decisions dating from the 1883 decision in Kendall took the position, and that was the view in the 19th century, that any requirement pertinent to a waiver of sovereign immunity was jurisdictional, no matter what it was. If the Court were to look at the critical paragraph in the decision in Kendall, which the government relies on, the first four sentences of that paragraph are an exposition of that rule. Any requirement, any bar is jurisdictional. Then the fifth sentence says, so what are the bars in the Tucker Act? And then it notes that there's a statute of limitations, which has the language that applies here. But if Congress had been familiar with those details, and we presume that sort of thing, though it's not entirely realistic, they would not have drawn from those decisions the view that the language of the Tucker Act was of any significance, because it wasn't applicable to that line of cases. Breyer. I take it, from what you have both argued so far, that there is nothing direct in the terms of a report or a hearing or a statement on the floor that shows that anyone in Congress, staff or member, ever thought about this problem. That's our argument. So what we're doing, then, is we are, however we do it, creating a number of — not a number of rules that the Court developed, which seek to determine what the, quote, intent of Congress was on the basis of other things, not necessarily what they said or what they — that's the situation. I think that's right, and we rely on the rules in the Arbonne cases about jurisdictional requirements and in Irwin about that equitable tolling. If — and as I was — just one more point about Irwin. As we noted in our brief, at the oral argument in Irwin, counsel for the United States pointed out that that language, shall be forever barred, was not of any distinctive importance and suggested it was probably language from the 19th century that was just common. And that's true. Most States used that very language at the time. It was just — it wasn't of any particular independent significance. With regard to the question asked by Justice Scalia about the Living Federal Tort Claims Act and what we're to do about the fact that the principles of interpretation in Irwin and the Arbonne line of cases weren't on the table back in 1946, this issue has come up in at least four cases. And the Court has, although in one instance over your dissent, taken the position that when those rules are announced, they don't have effective dates, they apply to all statutes. In Soriant, excuse me, in — excuse me, in the other one. Scalia, it seems to me that's incompatible with what I thought your position was, that it depends upon congressional intent. So we can just ignore everything you've argued up to here. It doesn't depend upon congressional intent, because we can give those words, meaning that the Congress did not give them at the time. You have to pick one argument or the other. Are you going to be bound by what the Congress at the time believed it was enacting or not? We agree with Justice Breyer that this is not, but — It's not a question of any indication of actual intent. The Court has taken the position that when new rules of this sort are adopted, they are applied to laws that didn't exist, that were adopted before that. Your decision for the Court in Young v. United States is a perfect example of that. In the — I'm sorry, that's wrong. Your decision for the Court in Sandoval is an example of that. In Sandoval, the issue was somewhat different. It was about whether to imply a private cause of action. And since the Court's decision in Court v. Ashe, this Court has had a somewhat more fairly demanding standard. But counsel for the plaintiff in that case, myself, argued that since the statute involved had been adopted under the ancien regime back in the days of J.I. Case v. Borak, that rule should apply. And you, the Court, unanimously rejected that argument. And it made — it made the point, which is completely applicable here, that court v. — the statute in Court v. Ashe had also been enacted under the ancien regime back before the days of Court v. Ashe, but that was the way the Court was going to apply it. That's precisely the situation here with regard to Irwin. Irwin is a statute adopted under the ancien regime, as you said. Arbaugh is a statute adopted before Arbaugh. Those rules are applied to all statutes. Now, if there's an affirmative demonstration of actual intent, if something was discussed, as Justice Breyer says, that might be a different matter. Alito, this is spinning out into degrees of abstraction that I hadn't anticipated. But it's hard for me to believe that Congress really had any intent whatsoever on these issues. I don't envision members of Congress sitting around thinking about these things. But put that aside. Do you — is it your argument that we should follow congressional intent or not? Or is it your argument that Congress's intent was to adopt, to say, this is jurisdictional and we delegate basically to the courts the determination of what is jurisdictional. So if they change their mind about the difference between jurisdiction and non-jurisdiction, then that's what this should mean. Which is it? I think the Court's answer — the cases in this Court give a slightly different answer to that question. With regard to whether something is jurisdictional, the clear statement rule is a clear statement rule, like any number of rules like that in the Court. Something — a particularly clear expression of the views of Congress would do, but it is not quite the same subjective intent for search — for intent that we might otherwise have. But certainly the Court — So it's not what Congress intended. You're saying that if they intended to — all they thought about was they had one idea about jurisdiction, they couldn't conceive of another one, they wanted it to be jurisdictional in accordance with their idea, but that would change? If others — if courts begin to think of jurisdiction differently. I think my answer is not limited to this clear statement rule. The Court has articulated a number of clear statement rules. I don't understand those rules to just drop from the case and then lead to the usual wide-ranging search and arrest. I think we're getting off the track that Justice Breyer put us on, and I think you would agree with him, that there's no evidence that Congress ever thought anything about what was going to happen in a case like Ms. Wong. They enacted a statute, and it had a statute of limitations, a firm statute of limitations, but there's no indication that Congress thought about jurisdiction. I mean, all that jurisdiction stuff comes from decisions of this Court. Yes, and I think in that circumstance, the — the Court's choice of controlling background presumptions and clear statement rules are controlling. Well, but that language — that language comes from decisions of this Court, exactly. But interpreting the precise language that was put into this Act in the same — same context as the Tucker Act. They were addressing a problem under the Tucker Act. They used that language. And whatever criticism you want to direct to the prior decisions of the Court, they have issued — they had issued rulings on those when the Congress was looking at the FTCA. But those rulings, we contend, had nothing to do with a particular language of the Tucker Act. Well, that may well be, but — No matter what — how the statute of limitations had been phrased, it would have been — There are a lot of statutes, perhaps most statutes, that are not explicit, that do not use the magic language that you insist this statute have. And when that happens, we don't just sit back and say, well, in that case, it's up to us. We don't say that. We have certain rules that determine what the presumptive intent of Congress was. And I don't care whether each individual member of Congress or, indeed, any single one of them had that in mind. They ordinarily don't. But we have rules, one of which, that is very strong, is that when you adopt the language from another statute, especially when it is in the same area, and this is the same area as the Tucker Act, it is eliminating the Tucker Act exemption for torts. When you have the same language, and it has been — that language has been interpreted by the courts uniformly over a period of years to mean a certain thing, we will presume that that is what Congress had in mind when it used the language. Now, if you're asking us to abandon that rule and just sit back in any case when the legislative history doesn't say anything and make up what we think should be the best answer, that simply is not the way we've proceeded. Nor should it be, Your Honor. It shouldn't. I mean, the — sorry. I mean, I would — what about many statutes existed saying and inferring, if it's certainly the use of the word, about men sitting on juries? And the statutes that say those things were enacted long before anyone thought a woman would ever sit on a jury. But when they're interpreted by the courts, by and large, they're interpreted to include both genders, all right? There are many instances. So certainly Justice Scalia is right, in my opinion, that that is a rule when he enunciates, but neither an absolutely firm rule nor the only rule. Well, I'm happy to agree with all that. But I think where we were, you think men needs women, right? Never mind. I don't think we have to address all that here. I'm sure you'll have another opportunity to discuss this. Mr. Schnapper, I think that I heard a disagreement between you and Justice Scalia on how close the words were. And you said, yes, there are some phrases in common. But there are big differences, too, in the wording of the Tort Claims Act. So you can pick out some words and say, yes, Congress adopted that language. But in other parts, it didn't take the Tucker Act as the model. It used different languages. That's true. In fact, there are some fundamental differences between the statutes, and we think they're important here. One of them is the point that was raised earlier, that Section 2674 says that in proceedings under the Federal Tort Claims Act, a defendant in the United States will be liable in the same manner and to the same extent as a private defendant. In a private action in State court, equitable tolling would be the rule. Now, there are a number of specific exceptions to the language of 2674, but none of them apply here. Can we think that? Roberts That's a principle that obviously doesn't cut across the board. In private actions in State court, for example, you do not have to give administrative agency notice within two years. There are all sorts of things that don't have a particular carve-out that don't apply to State court. Scalia No, no. That is one of the carve-outs, that you have to give notice. It's in the Federal Tort Claims Act. Roberts No, no. You're misunderstanding my point. In other words, just because the law says the United States will be liable to the same extent as a private party, doesn't mean that all the rules, I mean, as in State court, doesn't mean that all the rules that apply in, that you interpret them the same way across the board. There is no requirement that you give a two-years notice in a typical State court action. But under your theory, well, there ought to be, do you understand where I'm headed? Scalia I do. But our view is that having a narrow Senate general principle in 2674, Congress then went on in the Federal Tort Claims Act and spelled out a whole series of express areas where it designated a different Federal answer. And one of them is the presentment requirement. They actually went so far as to say the Federal rules of civil procedure are going to apply. There's a whole series of those. They're listed in footnote 28 in United States v. Richards. Section 2680 has 17 other exceptions. Congress would have reported a different result if they spelled that out. And you think in every other respect, the procedure under the Federal action is the same as under the State action? Presumptively, or it would be presumptive. Roberts It goes to liability, right? That's the word that's used? Liability. Scalia Well, it's been like that. I mean, if not procedures, I mean, the procedures are different, obviously. Yes, but a statute of limitations is a bar to liability. And it isn't just a question of how many depositions you would get. Scalia You know, I don't find the existence of those exceptions, and there are a lot of exceptions, so persuasive, because unlike the Tucker Act, the Tort Claims Act refers to State law. So you have to make exceptions unless you're going to suck in everything about State law, procedures and everything else. So, you know, it's sort of apples and oranges. The fact that those exceptions are there are explicable, not because Congress didn't think jurisdiction meant jurisdiction in the narrow sense, but rather because having referred us to State law, they had to make some exceptions from State law. Sotomayor Isn't your point, however, that this is a new regime, that it's not the Tucker Act, that it's something created? They may have borrowed from the Tucker Act some phrases and a couple of things, but they created a new statute. So to say they were wholesale taking the Tucker Act or even considering that they were duplicating the Tucker Act is not appropriate. I think that's right. As we've said, most of the statutes are entirely different. There's also another fundamental difference, which is the claims recognized by the Tucker Act were sent to the then newly created Federal Court of Claims, which only had whatever powers Congress was going to give it as it created it. But the government answered that you're saying the difference is district court has all kinds of equitable authority, claims court didn't. But the government answered that argument and said there's a difference between equitable doctrines, which the claims court followed. It's just that the claims court can't give equitable remedies like injunction. So the government's answer is there isn't that divide, that equity is part of the jurisprudence of the claims court. I think that argument relates to the argument that's been made by the plaintiffs in June. I'm making a different point, which is the point that would go, for example, to the presumption of equitable tolling and the standard for that articulated in this Court's decision in Holland v. Florida. Federal district courts already existed in 1946. They had the inherent power to engage in equitable tolling. There were no inherent powers in the Court of Claims in 1863. It didn't exist. Holland says that if Congress, that the fact that those powers were already there matters, and that there's going to have to be a strong showing that Congress in adopting a statute meant to take away the powers that normally exist. That problem doesn't exist under the Tuck Act because there were no powers to take away the statute. The courts were just being created at that time. If I could turn for a second from the issue of jurisdiction to the issue of equitable tolling, because the issues there are somewhat different, and as the government suggests, even if the statute is not jurisdictional, whether there's equitable tolling is a separate question. The government's argument relies primarily on the fact that a number of other statutes have statutory tolling provisions. They're labeled exclusions in the case of Section 2416. And the government argues that if there are some sort of statutory exclusion or sometimes it's called tolling in this Court's decisions, that would mean Congress didn't want equitable tolling. Now, that issue has been litigated before this Court several times. It was litigated in Young v. United States, where the taxpayer made the same argument that since there was a statutory exclusion or tolling provision, there couldn't be equitable tolling. This Court rejected it there, and the Court's opinion said that the statutory provisions and equitable tolling supplemented one another. The Court rejected it as well in Holland v. Florida. Now, there's an historical reason for all that. Tolling provisions or exclusions in statutes have always coexisted with equitable tolling, going back hundreds of years. The original English Statute of Limitations Act of 1623 had five exclusions and, in fact, four of the five exclusions in the Tucker Act came from that. And yet, despite the fact that English Statute of Limitations always had exclusions and they're carried over into colonial and American State legislation, there has also been equitable tolling. The two things coexist and supplement one another. And often, although not invariably, the statutory provisions operate differently than equitable tolling. Equitable tolling is an individualized, somewhat discretionary choice, and it requires a showing of hardship applicable to the individual. The statutory exclusions do not. The statutory exclusions are there whether the plaintiff had a compelling problem or not. So, for example, in the Tucker Act and, indeed, in the original English Statute of Limitations, there is a carve-out for people who are beyond the seas. And the statute of limitations doesn't begin to run as to them until they come back. That exists even if they're just across the channel in Calais and have a full-time agent in London to manage their affairs. There's not a requirement of hardship. So the government's argument, I think, misapprehends the fact, the history of all this, and the fact that these two provisions have always coexisted. And the government's legislative history argument largely fails on the same ground. What Congress did not adopt in the years prior to the Federal Torrents Claims Act were tolling, statutory tolling rules. They — and I think you could make a fairly good argument that Congress decided not to have statutory tolling rules, but they have always been separate from equitable tolling rules. The government, in its argument in Younger, made this point really well. I think it's about 20 to 26. Kennedy, are there any Federal statutes that permit equitable tolling? And how are they worded? Do they say equitable tolling? Oh, no. I don't know that one exists. But there are a number of Federal statutes which have statutory tolling where the Court has held there's also equitable tolling. That was Young and Holland. But based on the language of the statute, there are carve-outs. The carve-outs are statutory. The equitable tolling was always there. But what the Court said was the carve-out doesn't exist. But have the statutes recognized, A, there are carve-outs, and, B, there is something like equitable tolling there? I don't know of that. But what the Court's decisions hold is the existence of a statutory carve-out does not preclude the traditional exercise of discretion. And the legislative proposals that the government refers to for a carve-out may be reflected, I think it does reflect the decision by Congress not to have a statutory carve-out. That doesn't mean Congress was intending to bar equitable tolling. They've always been different and separate. And as the Court said in Young, they supplement one another. The Court has no further questions. Roberts. Thank you, counsel. Mr. Martinez, you have four minutes remaining. Mr. Martinez, I hate to cut any of your time, but it's important to me to understand why you think that if we rule for you, we will not be saying that every statute which allows suit against the Federal government and which uses the words shall be forever barred will not have to come out this way. What distinguishes this case from all those others? I think in this case, it's not just that phrase. It's the broader phrase that was lifted verbatim from the Tucker Act. And to my knowledge, there's no other statute that's been cited in their brief, there's no other statute that I'm aware of that's currently in effect that borrows that same language from the Tucker Act. And I think what this Court could also do is to say that I'm talking about the phrase every claim against the United States cognizable shall be forever barred unless. So I think you could put it that way. I mean, shall be forever barred seems to me to be the most important part of that language. I think that is the most important part, but I think that it's the incorporation of the entire phrase that can give the Court confidence that what Congress was doing here was directly lifting something from the Tucker Act. Sotomayor 24 were once just as a tort claim against the United States. I don't know how else you would say it, where else you would borrow it from if what you're interested in is making sure that the U.S. is responsible, that you're effectuating a waiver of sovereign immunity. Justice Sotomayor, I think that the language that I'm referring to is the one that was in the original 1946 FTCA, which tracked verbatim the language from the Tucker Act. And so I think that this Court can issue a narrow opinion that's focused on the FTCA that emphasizes that that was, that language was lifted verbatim. It was essentially cut and pasted from the Tucker Act, and it was intended to bring along with it. Sotomayor Has the Tucker Act been amended? Take that language out? The Tucker Act provision has been amended slightly. It appears in 2501. And what this Court said in John R. Sand and Gravel was that the minor changes that had been made to the Tucker Act language were essentially insignificant. Is there anything else you would say to Justice Scalia? Is it just shall be forever borrowed, plus a few more words? Anything else? Justice Kagan, I think it's the same points that I made in response to your question earlier. I think there are a bunch of other features of this particular statute of limitations. The fact that the Court had addressed it in Soriano, the fact that the Court addressed it, although perhaps in dicta, in Contric, the private laws that had expressly addressed this particular statute, the fact that it was reenacted in 1966 against a consistent backdrop of incorporation. As far as Contric is concerned, that line of cases, I thought, came out with Bowles against Russell and John R. Sand, that we're not going to undeclare something in jurisdiction that we, the Court, but when we're dealing with a statute that this Court has said that about, then we don't carry over that ancient regime. Justice Ginsburg, I think in footnote 8 of the Contric opinion, this Court referred to 2401b, and it said that it confined review of district courts and was of a similar order to 28 U.S.C. 2107, which was the provision that was later at issue in Bowles. And in Bowles, this Court referred to footnote 8 of Contric and used that footnote, which referred to 2107, and to the time bar of the FTCA, and it used that footnote as a reason to conclude that 2107 was jurisdictional. And we think the same conclusion follows here. I think the key point about that is that in Bowles, with respect, Justice Ginsburg. I seem to remember that, Justice Ginsburg, but I think the Court's opinion in Bowles expressly addressed the meaning of that Contric footnote. I think stepping back a little bit from the weeds here that we've been discussing, my colleague and I have been getting into the details of the legislative history. I think the big picture here is that Congress, from the 1920s through the 1980s, repeatedly engaged with the issue of equitable tolling, and at every turn, it signaled its intent not to allow equitable tolling. We ask for reversal. Thank you, counsel. The case is submitted.